RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEHOE COMPONENT SALES INC., dba Pace
Electronic Products; PACE TECHNOLOGY CO. LTD.;
ESTATE OF FRANK PATRICK KEHOE,

                *Plaintiffs-Appellants,*

    *v.*

BEST LIGHTING PRODUCTS, INC.,

                *Defendant-Appellee.*

No. 14-3347

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00789—Edmund A. Sargus, Jr., Chief District Judge.

Argued:  June 18, 2015

Decided and Filed:  August 5, 2015

Before:  GRIFFIN and DONALD, Circuit Judges; and TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Ronald G. Hull, UNDERBERG & KESSLER LLP, Rochester, New York, for Appellants.  Gregory P. Barwell, WESP BARWELL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Ronald G. Hull, UNDERBERG & KESSLER LLP, Rochester, New York, James D. Colner, SHUMAKER, LOOP & KENDRICK, LLP, Columbus, Ohio, for Appellants.  Gregory P. Barwell, E. Joel Wesp, Quinn Schmiege, WESP BARWELL, Columbus, Ohio, for Appellee.

_____

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.  This appeal stems from a manufacturer's decision to copy a former collaborator's products and market the cloned products as its own.  After Best Lighting Products, Inc. ("Best") brought to appellants (collectively, "Pace") the idea to manufacture certain specialized lighting products for Best, Pace agreed to do so.  But after Pace manufactured enough units to fill Best's product orders, Pace used the same molds (or "tooling") to manufacture thousands of additional units of exactly the same products.  Pace then began selling these cloned products under its own name to several of Best's customers, urging them to buy the identical product directly from Pace rather than from Best.  The parties eventually sued each other, and, after a bench trial, the district court found Pace liable to Best for misappropriation of trade secrets under Ohio law, "reverse passing off" and false advertising in violation of the Lanham Act, breach of contract, tortious interference, conversion, and breach of warranties, and awarded compensatory and punitive damages, attorneys' fees, and injunctive relief.

Pace appeals.  Although we agree with Best that the district court did not err in finding Pace liable for breach of contract and tortious interference, we agree with Pace that the district court erred in its resolution of the trade secrets claim, the Lanham Act claims, the conversion claim, and the warranties claim.  We therefore affirm in part, reverse in part, vacate in part, and remand.

I.

Best designs and markets exit signs and emergency lighting products for commercial buildings.  Since its beginnings in 1987, Best's modus operandi generally has been to model its products on other companies' patented products and then alter the products' design in order to make "something unique or different" about them and to produce them at a lower cost than competitors.

In 2000, Best began purchasing some of the parts for their products from Pace.  Soon afterward, Pace began making fully assembled products for Best, to Best's specifications.

Before this time, Pace had never manufactured any emergency lighting products. Because Pace had never before made these types of products, Best's founder, Alvin Katz, spent a significant amount of effort instructing Pace on how to manufacture the tooling necessary to make the particular products that Best wanted Pace to manufacture.

During the initial years of the companies' business relationship, there was no contract prohibiting Pace from competing with Best. As Katz put it, "In my world, if a guy shook hands and you promised to do something, you did it. . . . [I]s there a piece of paper? No, there was never a contract. We didn't do that."

But Katz soon began to suspect that his confidence in his business partner's integrity had been misplaced. In August 2004, Katz emailed Pace's president complaining that Pace not only had begun selling products that were identical to the products that it made for Best, but also that Pace had begun selling them to Best's established customers. Apparently, Pace was filling orders for Best and then using the same tooling to manufacture additional units of exactly the same products. Pace then sold these cloned products as its own, bypassing Best.

The companies' interactions soon became filled with strife. In 2005, Best complained that some of the products that had been manufactured for it by Pace were defective. The parties negotiated an agreement referred to as "the Big Wash" in which Pace transferred to Best ownership of some of the tooling that was used to manufacture the products in question. In 2006, Best refused to pay for a substantial number of products that Pace had delivered to it, and Pace stopped shipments to Best.

To resolve the impasse, the parties negotiated a Supply Agreement effective January 10, 2007, and lasting one year. Best agreed to pay its outstanding debt to Pace and to purchase a minimum of $7 million worth of products from Pace annually, and Pace agreed to a variety of provisions, including to warrant the quality of the goods, not to "use any tooling owned by Best other than for the manufacture of products for sale to Best," to "assign[ ] to Best all designs and intellectual property . . . for products developed or to be developed at or by Pace for Best," and neither to "sell emergency lights or exit signs nor ballasts, nor solicit sales of these items to any party in North America without Best's prior written consent."

Pace received several purchase orders for cloned products from North American companies before the Supply Agreement came into effect, and it shipped products to fill these orders after the agreement came into effect.

Best continued to complain that Pace was manufacturing defective products, and by April 2008, Best told Pace that "we are at a point where we both know we will not be doing any more business." Best requested that Pace return the tooling that Best owned, especially to prevent Pace from "using our tooling to make product for other customers."

By the time the parties stopped their ongoing commercial relationship, Pace was in possession of all of the tooling that had been used to manufacture both Best's products and the cloned products, and Best owed Pace almost $900,000 for products delivered but not yet paid for.

In August 2008, Pace filed a diversity action against Best in federal district court, alleging that Best had breached its contractual obligations by failing to pay for the $900,000 worth of products that Pace had delivered to it. *See Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*, No. 2:08-cv-00752-EAS-TPK, DE 2, PgID 4-5 (S.D. Ohio). Best requested a setoff of damages for breach of warranty and counterclaimed for breach of contract, tortious interference, misappropriation of trade secrets, conversion, and fraud. *See id.* at DE 8, PgID 30, 37-45.

The parties were still litigating the case two years later in August 2010 when Pace filed a separate action against Best in Ohio state court, alleging that Best's counterclaims had it entirely backward: according to Pace, *Best* had misappropriated *Pace's* trade secrets and *Best* had tortiously interfered with *Pace's* contracts. Best removed the suit to federal court and responded in September 2010 not only with the same counterclaims that it had previously alleged in 2008, but also with many new ones, including several claims under the Lanham Act and for patent infringement. (These counterclaims were later amended.) The removed case was consolidated with the parties' still-pending federal-court litigation.

The parties eventually filed cross-motions for summary judgment, which the district court granted in part and denied in part. After a bench trial on the remaining claims and

counterclaims, the district court found that Best had breached its contractual obligations by failing to pay for the products that Pace had delivered, but that Pace was liable to Best for breach of warranties, breach of contract, tortious interference, misappropriation of trade secrets, conversion, and both false designation of origin and false advertising under the Lanham Act. (Best previously conceded that its patent infringement claims were without merit.) The district court awarded Best $1,133,697.10 in compensatory damages, $200,000.00 in punitive damages, and $851,102.85 in attorneys' fees. The district court also entered an order permanently enjoining Pace from manufacturing the cloned products in question and from using or referencing products that "originated with Best" in its marketing materials.

Pace appeals.

## II.

The first issue in this appeal is a question of timing: Pace argues that Best's trade secrets claims were time-barred by the statute of limitations. The district court disagreed. Its interpretation of the statute of limitations is a question of law that we review de novo. *Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs*, 718 F.3d 590, 593 (6th Cir. 2013).

Ohio's Uniform Trade Secrets Act ("OUTSA")—under which Best's claims arose—requires that "[a]n action for misappropriation shall be commenced within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim." Ohio Rev. Code § 1333.66. The district court found that "the actual injury that started the clock came in August of 2004," when Best's founder, Alvin Katz, learned that Pace was selling to Best's customers products that were facsimiles of Best's wares and confronted Pace about it. Best, however, did not file its OUTSA counterclaims against Best until more than four years later—in October 2008. *See Kehoe Component Sales, Inc. v. Best Lighting Prods., Inc.*, No. 2:08-cv-00752-EAS-TPK, DE 8, PgID 41–42 (S.D. Ohio).

Despite the fact that Best filed its OUTSA claims more than four years after learning that Pace was using Best's purported trade secret—its "know-how" about the emergency lighting design and manufacturing process—to compete with Best, the district court concluded that

Best's filing was timely because "Pace misappropriated Best's trade secret with respect to know-how *again*"—*i.e.*, after August 2004—"when it brought competing . . . products to bear in the market on or after January 10, 2007, all with the aid of the know-how conveyed by Mr. Katz." In other words, the district court held that Pace's continued use of the purported trade secret meant that at least part of its conduct fell within the applicable limitations period.

The district court's reasoning was incorrect. OUTSA specifically incorporates the Uniform Trade Secrets Act's ("UTSA's") provision that "a continuing misappropriation constitutes a single claim." Ohio Rev. Code § 1333.66. UTSA adopted this approach precisely to reject the type of reasoning to which the district court subscribed. Prior to UTSA, jurisdictions were split on whether the limitations period ran only from the initial misappropriation, or whether it was triggered anew with each act of misappropriation. *See* UTSA § 6, cmt. (1985). The difference in the approaches rested on the underlying rationale for punishing the misappropriation of a trade secret. Jurisdictions that restarted the limitations period with each act of misappropriation did so on the theory that "a trade secret is in the nature of property, which is damaged or destroyed by the adverse use." *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 293 (9th Cir. 1969) (explaining *Underwater Storage, Inc. v. U.S. Rubber Co.*, 371 F.2d 950, 955 (D.C. Cir. 1966)). By contrast, jurisdictions that ran the limitations period only from the initial act of misappropriation believed that "[i]t is the relationship between the parties at the time the secret is disclosed that is protected," and that "[t]he fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated." *Id.*

UTSA's declaration that "a continuing misappropriation constitutes a single claim" expressly adopts the latter approach and rejects the former. UTSA § 6 & cmt. OUTSA's identical provision follows suit. Ohio Rev. Code § 1333.66. Under OUTSA, as we have observed, "the first discovered (or discoverable) misappropriation of a trade secret commences the limitation period, placing the focus . . . on the breach of the relationship between the parties at the time the secret is disclosed." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, No. 13-4103, 2015 WL 1137429, at *7 (6th Cir. Mar. 16, 2015) (unpublished) (citation omitted).

The district court, in concluding that OUTSA's limitation period was retriggered by Pace's continued use of the same trade secret, improperly reverted to a property-based theory of trade-secret misappropriation, under which each successive use of a trade secret is an additional wrong. That theory was rejected with the adoption of OUTSA. *See Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007) (noting that the continuing wrong approach would render the statute of limitations "meaningless"). OUTSA's limitations period runs not from each time that a trade secret is used, but from the first moment of its reasonably discoverable misappropriation. *See Monolith*, 407 F.2d at 293. Because the four-year limitations period began when Best became aware in August 2004 that Pace had misappropriated its purportedly proprietary knowledge, and because Best does not argue that the limitations period was otherwise tolled, the district court erred in concluding that Best's OUTSA claims were timely filed.

Best fails to mount a persuasive argument to the contrary. Instead of arguing that the district court made a clearly erroneous factual finding when it found that Katz's August 2004 email demonstrated Best's knowledge that Pace had misappropriated its manufacturing "know-how," Best asserts that Pace misappropriated new and different trade secrets each time it manufactured a new knockoff product. But the district court did not agree, and Best fails to identify what those alleged trade secrets might be, especially considering that "readily ascertainable" design features of individual products are not trade secrets. *Al Minor & Assoc., Inc. v. Martin*, 881 N.E.2d 850, 853 (Ohio 2008) (quoting Ohio Rev. Code § 1333.61(D)); *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 818 (Ohio 1986). As the district court found, the only arguable "trade secret" that Pace misappropriated was the unitary, generalized knowledge of the lighting design and manufacturing process that it had learned from Best. Pace leveraged this knowledge for its own ends as early as August 2004. Thus, to be timely under OUTSA, Best's claims should have been filed within four years of when it first learned that Pace was misusing this information in August 2004. Its October 2008 filing was two months too late.

Best also attempts to salvage its OUTSA claims by arguing that the district court was wrong to find that it had been injured in August 2004, asserting that it was injured only in

2007 when Pace continued to sell competing products to Best's customers. But that is a restatement of the district court's erroneous rationale. Clearly Best was aware that it had been injured by competing sales as early as August 2004; although the damage possibly grew more extensive through Pace's continued use of the knowledge that it had gleaned from Best, Best knew that Pace was already implementing for its own ends the techniques and information that it had learned from Best.

Because the district court erred in failing to hold that Best's OUTSA claims were time-barred, its finding that Best prevailed on these claims and was due damages on them must be reversed. We express no opinion on whether Best's knowledge of the manufacturing techniques in question qualifies as a protectable trade secret under OUTSA. *See Al Minor*, 881 N.E.2d at 853 (noting elements).

## III.

Next, Pace argues that the district court erred in finding that Pace violated the Lanham Act's prohibitions against false designation of origin (the "reverse passing off" claim) and false advertising. We agree.

## A.

The first aspect of Pace's challenge to the district court's Lanham Act determination is whether the district court erred in finding that Best's claims were timely. "The Lanham Act does not contain a statute of limitations," so determining whether a Lanham Act claim is time-barred depends upon the defendant's ability to show that the claim is barred by laches. *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985). "Laches is the negligent and unintentional failure to protect one's rights." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002) (internal quotation marks omitted). Where there is no dispute that the laches doctrine applies to a given type of claim, we review a district court's determination that laches applies in a particular case only for an abuse of discretion. *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 493 (6th Cir. 2007); *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).

Ordinarily, a party asserting laches must show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Nartron*, 305 F.3d at 408. In the Lanham Act context, we have developed a framework that helps add substance to the general equitable principles embodied in the doctrine. For claims under the Lanham Act, the laches period begins to run when the plaintiff has "actual or constructive knowledge of the alleged infringing activity." *Id.* (citation omitted). If the plaintiff has filed its Lanham Act claim within the time that it would have been required to file in the forum state a state-law claim for injury to personal property, then the plaintiff's delay in asserting its rights is presumptively reasonable. *See id.* But a delay beyond the analogous limitations period "is presumptively prejudicial and unreasonable." *Id.*; *see also Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321 (6th Cir. 2001).

In this case, the parties agree that the relevant benchmark is Ohio Rev. Code § 2305.10(A)'s two-year limitations period. As Pace observes, Best knew that Pace was selling cloned products to competitors as early as August 2004. Yet Best did not file its Lanham Act counterclaims against Pace until more than six years later, in September 2010. Pace therefore argues that Best's claims are presumptively barred by the doctrine of laches. *See Tandy*, 769 F.2d at 365.

Best, on the other hand, stresses that the presumption that arises after the lapse of an analogous limitations period is not irrebuttable; in the end, the laches analysis depends upon whether the plaintiff lacked diligence in asserting its claim and whether the defendant was prejudiced by the plaintiff's dithering. That is because, "[u]nlike statutes of limitations, laches is not a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (internal quotation marks and ellipsis omitted). And as Best points out, it spent much of the time before the dispute hit the courts—albeit with substantial periods of inactivity—attempting to negotiate with Pace to restore the commercial relationship. Generally, "attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999) (internal quotation marks omitted). "A reasonable businessman should be afforded some latitude to assess

both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue." *Tandy*, 769 F.2d at 366.

Although the record does not fully explain why Best failed to file its Lanham Act claims at the same time or soon after it filed its trade-secrets claims against Pace in October 2008— waiting almost another two years before finally asserting Lanham Act violations—we do not need to determine whether the district court's laches determination was an abuse of its discretion. Even assuming that the defense of laches does not bar Best's Lanham Act claims, they are destined to fail on the merits, as we explain below.

B.

"[O]n an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 547 (6th Cir. 2010). The district court concluded as a matter of law that, on the facts it found, Pace violated the Lanham Act both with respect to false advertising and to false designation of origin (the "reverse passing off" claim). This was error.

1.

Section 43(a) of the Lanham Act makes liable

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]

15 U.S.C. § 1125(a)(1).

The district court found that Pace violated § 43(a) in two ways. First, it found that Pace, in representing that the cloned products that it manufactured and sold had been produced by Pace

rather than by Best, made a false designation of origin that was likely to cause consumer confusion, violating 15 U.S.C. § 1125(a)(1)(A). Second, the district court found that Pace violated § 1125(a)(1)(B)'s prohibition on false advertising by similarly misrepresenting in its marketing catalogs "the origin of the [cloned products]." Both of the district court's conclusions were erroneous.

2.

The district court and the parties all agree that Best's false-designation claim proceeded under what is known as a "reverse passing off" theory. "Passing off" refers to counterfeit production; it occurs when a firm "puts someone else's trademark on its own (usually inferior) goods," *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005)—for instance, "the Coca–Cola Company's passing off its product as Pepsi–Cola." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1, 32 (2003). "Reverse passing off" is the converse: a firm sells someone else's goods or services, misrepresenting them as its own—for instance, the Coca–Cola Company taking Pepsi–Cola's flagship beverage and marketing it as the Coca–Cola Company's own product. *Id.*[1] In this case, therefore, Best's reverse passing off claim argued—and the district court found—that Pace falsely represented that the cloned products originated with Pace when in fact they originated with Best.

The problem with this conclusion is the district court's assumption that the cloned products that were manufactured by Pace somehow belonged to Best. *See, e.g.*, PgID 5095 (identifying as "Best products" items that "were manufactured by Pace, with a Pace product number, in a box Pace made, with Pace's UL number on the product"). Again, Pace filled orders for Best and then used the same tooling to make a separate batch of exactly the same product for its own customers. Only by denominating the cloned products as "Best's products" could the district court find that Pace was misrepresenting someone else's products as its own. And only by concluding that Best's role in originating the intellectual concepts for the cloned products made it the "origin" of the products for purposes of § 43(a) could the district court find

---

[1]"Why would anyone want to do such a thing? One reason might be to obliterate the plaintiff's corporate identity and prevent him from entering new markets, where the defendant, having appropriated the plaintiff's trademark, would claim that the plaintiff was the infringer." *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 987 (7th Cir. 2004).

that the products were, in fact, "Best's products." Boiled down, then, the district court's liability finding on the reverse passing off claim depended upon its conclusion that Pace falsely designated the cloned products' "origin" by failing to represent to its customers that the products—although manufactured by Pace—stemmed from ideas or intellectual property that were initially brought to the table by Best.

But as the Supreme Court has pointed out, the Lanham Act protects the ability to control one's brand; it does not protect the ability to control one's inventions or innovations. *Dastar*, 539 U.S. at 32, 34, 37. With respect to false-designation claims specifically, the Act's use of the term "origin" does not refer to "the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id*. at 32. It denotes only "the producer of the tangible product sold in the marketplace"—and, by extension, possibly also "the trademark owner who commissioned or assumed responsibility for . . . production of the physical product." *Id*. Thus, in the context of a reverse passing off claim, use of a trademark makes a representation regarding only the product's physical origin, not its intellectual ancestry. *See* Mark P. McKenna, *Dastar's Next Stand*, 19 J. INTELL. PROP. L. 357, 374 (2012) ("A trademark cannot be taken to indicate anything about the origin of the intellectual creation embodied in that good.").

As *Dastar* makes plain, an entity makes a false designation of origin sufficient to support a reverse passing off claim only where it falsely represents the product's geographic origin or represents that it has manufactured the tangible product that is sold in the marketplace when it did not in fact do so. 539 U.S. at 29, 31. In *Dastar*, the Court observed that the defendant would have violated § 43(a) if it "had bought some of [the plaintiff's] videotapes and merely repackaged them as its own." *Id.* at 31. But because the defendant "produced its very own series of videotapes" and was thus the manufacturer of "the physical 'goods' that [were] made available to the public," the court held that the defendant's designation of itself as the "origin" of the goods was not false, even though its products were almost wholesale copies of the plaintiff's previous work. *Id.*

Thus, reselling goods that have been manufactured by someone else carries different consequences than making your own copies of those goods and marketing them under your own mark. "[T]aking tangible goods and reselling them as your own constitutes a Lanham Act

violation; taking the intellectual property contained in those goods and incorporating it into your own goods does not." *Stolle Mach. Co.*, 2015 WL 1137429, at *12 (citation omitted); *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004) (no reverse passing off where the defendant copied software ideas and concepts but did not take "tangible copies" of the software and market them under its own mark); *Zyla v. Wadsworth, Div. of Thomson Corp.*, 360 F.3d 243, 252 (1st Cir. 2004) (no reverse passing off where the defendant was the manufacturer of the physical book, even though it allegedly failed to attribute the source of its creative content); *McArdle v. Mattel Inc.*, 456 F. Supp. 2d 769, 783 (E.D. Tex. 2006) ("'[O]rigin of goods' means the physical producer of tangible products marketed and sold."); *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 648, 652 (D. Del. 2006) (holding that corn seed—not the seed's genetic traits—was the tangible product relevant to a reverse passing off claim).

In this case, it is undisputed that Pace manufactured the tangible cloned objects that it represented as having manufactured. The undisputed facts thus show that Pace never made a false designation of the products' "origin" within the meaning of § 43(a). Pace represented that the cloned products originated with Pace; and even though the ideas and initial design may well have originated with Best, the tangible products themselves did not. *See Dastar*, 539 U.S. at 34. For purposes of the Lanham Act, the physical products originated with Pace, the entity that manufactured them. Where the initial ideas for the products came from is irrelevant. *Id.* at 32; *see also Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 228 (S.D. N.Y. 2013) (no reverse passing off where defendant represented goods as its own and plaintiff did not manufacture the goods but only "had a distribution contract with [defendant] by which [defendant] would manufacture the products and distribute them").

Best resists this conclusion by asserting that it, not Pace, was the "origin" under *Dastar* because it "commissioned or assumed responsibility for ('stood behind') production of the physical product." *Dastar*, 539 U.S. at 32. But Best's argument neglects two important things. First, *Dastar* opined only that a "*trademark owner* who commissioned or assumed responsibility" for the production of the product might qualify as the product's origin. *Id.* (emphasis added). Best has never claimed that it owns a relevant trademark with respect to the Pace-branded, cloned products. Second—and more fundamentally—Best neither

"commissioned" nor "assumed responsibility" for the cloned products. *Id.* Pace manufactured them on its own initiative and against the wishes of Best. As tangible objects, the cloned products are in every respect Pace's alone—Best would much rather that they never have been produced at all. Under no reading of *Dastar* can Best be considered the cloned products' "origin" within the meaning of § 43(a). *See Enzo Biochem*, 981 F. Supp. 2d at 228 ("[T]he author of ideas is not the origin of goods if the author is not also producing those goods in tangible form." (internal quotation marks and alteration omitted)).

Nor is Best's position supported by authority suggesting that a reverse passing off case "includes situations in which a defendant markets another's product that has been only slightly modified and then relabeled." *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1241 (8th Cir. 1994); *see also Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990). *But see Bretford*, 419 F.3d at 580 ("No one makes a product from scratch, with trees and iron ore entering one end of the plant and a finished consumer product emerging at the other."). Even assuming that this line of authority has survived *Dastar*, it is inapposite because Pace was not reselling a product that had been manufactured by Best. Instead of taking a preexisting tangible object and then modifying it, Pace manufactured "its very own series" of objects, albeit using ideas that it had gleaned largely from Best. *Dastar*, 539 U.S. at 31. As far as the tangible items are concerned, Pace was not marketing Best's products; it was marketing its own.

To the extent that the district court's liability finding stemmed from an intuition that the Lanham Act prohibits wholesale copying, that intuition is misplaced. Protection against imitation and mimicry ordinarily is found in patent and copyright law, not in the Lanham Act. "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). The Lanham Act—which, unlike the patent and copyright regimes, creates exclusive rights that have no automatic expiration—does not create "a species of perpetual patent and copyright," nor does it create "a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution." *Dastar*, 539 U.S. at 33–34, 36, 37. That is because the Act "does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Id.* at 34.

Instead, the Lanham Act's "general concern is with protecting consumers from confusion as to source," *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989), and preventing consumer confusion does not warrant reading § 43(a)'s prohibition against false designation of origin so broadly that it provides a way for inventors to stifle indefinitely the mimicry of items that have been neither patented nor copyrighted. *Dastar*, 539 U.S. at 34–37; *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 513 (6th Cir. 2013). It does not matter that Best may have created the market for the products in question. *See Dastar*, 539 U.S. at 36–37 (production of knockoff product is not reverse passing off); *Bretford*, 419 F.3d at 581 (same). Best cannot use a false-designation Lanham Act claim to substitute for failing to have a protectable intellectual property right in the products.

Because "the person or entity that originated the ideas" embodied in a good or service is not the "origin" of the good or service for purposes of § 43(a), a manufacturer does not falsely designate a product's origin under the Lanham Act if it makes an exact replica of someone else's item and labels the item as its own. *Dastar*, 539 U.S. at 32. At bottom, Best's Lanham Act claims are an attempt to recover from Pace for stealing its product ideas to manufacture a rival, facsimile product. That is not what the Lanham Act guards against. *Id.* at 34. "Businesses often think competition unfair, but federal law encourages wholesale copying, the better to drive down prices. Consumers rather than producers are the objects of the law's solicitude." *Bretford*, 419 F.3d at 581. "The right question . . . is whether the consumer knows who has produced the finished product" even if "most of the product's economic value came from elsewhere." *Id.* Regardless of whether Pace's conduct was prohibited under other legal regimes, it was not prohibited by the Lanham Act.

3.

The district court's finding that Pace also violated § 43(a)'s prohibition against false advertising, *see* 15 U.S.C. § 1125(a)(1)(B), is defective for largely the same reasons. The parties appear to assume that the false-advertising claim is almost exactly identical to the false-designation claim. The district court followed suit, holding that § 1125(a)(1)(B) prohibits exactly the same reverse passing off behavior—a defendant "marketing other companies' products as its own"—that is prohibited under § 1125(a)(1)(A). For the same reasons that it

found that Pace had falsely designated the products' origin, the district court found that Pace's use of "Best products" in Pace's own catalogs "constitutes a misleading representation through marketing as to the origin of a product" and thereby violated § 1125(a)(1)(B).

This reasoning was not quite correct. Even if the analysis of a false-advertising claim exactly mirrored the analysis of the false-designation claim, the district court would have been incorrect to conclude that a product's "origin" references the originator of the concepts embodied in the product. Under *Dastar*, the term denotes only the manufacturer of the tangible object, which means that Pace's advertising was not false. *See* 539 U.S. at 32.

But in any event, false-advertising claims involving a misrepresentation about a product's "origin" under subsection (B) are not subject to an analysis that is identical to false-designation claims under subsection (A). Subsection (B) prohibits the use in commercial advertising of a false "designation of origin" or other factual misrepresentation about "the nature, characteristics, qualities, or geographic origin" of the goods or services in question. 15 U.S.C. § 1125(a)(1)(B). The products' geographic origin is not at issue in this case. And as we have previously suggested, a misrepresentation about the source of the ideas embodied in a tangible object (such as a misrepresentation about the author of a book or the designer of a widget) is not a misrepresentation about the nature, characteristics, or qualities of the object. *Romero v. Buhimschi*, 396 F. App'x 224, 233 (6th Cir. 2010). Absent a false statement about geographic origin, a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the "characteristics of the good itself"—such as its properties or capabilities. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008). The statute does not encompass misrepresentations about the source of the ideas embodied in the object (such as a false designation of authorship); to hold otherwise would be to project the Lanham Act into the province of the Copyright and Patent Acts. *See Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1307 (Fed. Cir. 2009). *But see* Malla Pollack, *Reclassifying Reverse Passing Off As Failure to Contract or As False Advertising*, 17 B.U. J. Sci. & Tech. L. 40, 49–50 (2011) (arguing that use of a competitor's branded product in advertising materials, even where the mark is not visible, could support a false advertising claim).

The district court did not find that Pace made any false representation about the characteristics of the cloned products themselves; it found that Pace's advertisements were false only because they represented that Pace, rather than Best, was the intellectual origin of the products. Because § 1125(a)(1)(B) does not impose liability for misrepresenting the intellectual progenitor of a tangible product, the district court erred in finding that Pace's conduct violated the statute. Its judgment finding Pace liable on both Lanham Act claims is reversed.

IV.

Pace also argues that the district court erred in finding that Pace breached the Supply Agreement into which the parties entered in January 2007 and which remained in effect until January 2008. The district court found that Pace breached three clauses of the Supply Agreement: the non-compete clause, the assignment clause, and the use clause. Again, the district court's factual findings are reviewed for clear error while its conclusions of law are reviewed de novo. *Beaven*, 622 F.3d at 547. We agree with Best that the district court did not err in concluding that Pace breached all three provisions of the agreement.

A.

The Supply Agreement's non-compete clause provided that "Pace shall not sell emergency lights or exit signs nor ballasts, nor solicit sales of these items to any party in North America without Best's prior written consent." Before the agreement was signed, Pace received several purchase orders for cloned products from North American companies. The parties do not dispute that Pace shipped products to fill these orders after the agreement came into effect. They disagree, however, on whether shipping products to fill a previously received order constitutes a "sale" of the products.

The district court found that the non-compete clause's use of the term "sell" was ambiguous, determined that the parties had intended to prohibit Pace from transferring title in any competing products, concluded that title had been transferred when the products were shipped, and found as a consequence that Pace's shipments breached its promise not to "sell" competing products while the agreement was in force. Pace argues that the district court's determination of the meaning of the term "sell" was clearly erroneous. As proof of its position

regarding the parties' intent, Pace observes that representatives of both Pace and Best subsequently indicated that they believed a "sale" took place at the moment that a purchase order was accepted instead of when the products were shipped.

Pace is incorrect that the district court committed clear error. The term "sell" is not ambiguous. Pace and Best agreed that the Supply Agreement would be governed by Ohio law. Regardless of the parties' subsequent lay interpretations, Ohio law provides clear definitions of the terms "sell" and "sale" within the context of agreements to transfer goods. Under Ohio's Uniform Commercial Code, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Ohio Rev. Code § 1302.01(A)(11). Although a promise to ship goods in response to a purchase order gives rise to a contract to sell them, *see* Ohio Rev. Code §§ 1302.01(A)(11), 1302.09(A)(2), title to the goods passes only when the goods are delivered unless the parties explicitly agree otherwise. *See* Ohio Rev. Code § 1302.42(B).

Even though Pace's entry into the contracts to sell the goods in question may have occurred before it entered the Supply Agreement, title to the goods did not pass until the goods were delivered to its customers. The district court was not wrong to read the Supply Agreement as incorporating this commonplace meaning of "sale," and it did not clearly err in finding that Pace's shipment and delivery of the goods in question after entering the agreement breached its obligations under the non-compete clause.

B.

Under the Supply Agreement's assignment clause, Pace agreed to "assign[ ] to Best all designs and intellectual property (and all derivations thereof) for products developed or to be developed at or by Pace for Best." Observing that the term "design" is quite broad, the district court found that "[a]t least some level of creativity went into the design of the products Pace manufactured for Best" and found that Pace breached the assignment clause when it used "the same designs" to manufacture the cloned products that it had used to manufacture the products ordered by Best.

Given the breadth of the term "design," we hold that the district court did not commit clear error in finding that Pace breached the assignment clause. Particularly in light of the

parties' prior history, the term "design" encompasses a much broader array of creative output than is protectable under intellectual property regimes. *See, e.g., Webster's Unabridged Dictionary of the English Language* 539 (2d ed. 2001) (defining the noun "design" as including "an outline, sketch, or plan" of a work to be created, "the combination of details or features" of an object, or "a plan or project"). There is no dispute that Pace created the tooling that it used to manufacture both Best's products and the cloned products. And Pace's president agreed that Best "would give us the general description of what they wanted the product to do and we would develop it for them." Even if Pace primarily copied products that already existed on the market, its designs for the tooling and the products—even if not protectable intellectual property—were nonetheless assigned to Best under the Supply Agreement. The district court did not clearly err in finding that Pace's use of the designs for its own line of products violated the assignment clause.

C.

The Supply Agreement's use clause provided that "Pace shall not use any tooling owned by Best other than for the manufacture of products for sale to Best." The district court found as a matter of fact that Best owned "all of the tooling" that Pace used to manufacture both the products for Best and the cloned products, concluding that Pace had therefore breached the contract. Pace does not dispute that Best owned *some* of the tooling, the ownership of which Pace specifically transferred to Best in "the Big Wash" transaction in order to assuage Best's claims that Pace had shipped to Best numerous defective products. But Pace contends that the district court's finding that Best owned *all* of the tooling was clearly erroneous because, according to Pace, Best failed to prove that it owned anything other than the tooling that was transferred in the Big Wash.

Pace is incorrect. Best executives testified that, pursuant to industry standard, Best purchased the tooling by amortizing its cost per unit ordered from Pace. Pace's president similarly admitted that Best paid "for its own tooling," and other evidence showed that Pace generally used only a single set of tooling to make both the cloned products and the products that Best ordered. Given this testimony, the district court did not clearly err in finding as a matter of fact that Best owned all of the tooling upon which its products were made and that Pace used

Best-owned tooling to manufacture numerous of the cloned products. Although Pace insists that the district court's findings must be reversed because Best failed to prove that each of the cloned products was made on Best-owned tooling, those arguments are better resolved at the damages phase rather than on the question whether Pace breached the use clause. The district court's finding that Pace breached each of these three clauses of the Supply Agreement is affirmed.

V.

Pace next argues that the district court erred in finding it liable for conversion. Best predicates its conversion claim upon only the tooling that Best owned pursuant to the "Big Wash" transaction in 2005. The district court found that Pace retained possession of the tooling, rather than returning it to Best upon request, and that Pace was therefore liable for converting Best's tooling.

In Ohio, a conversion claim requires a plaintiff to demonstrate not only that the defendant dispossessed the plaintiff of its property and caused the plaintiff damage, but also that the defendant's interference with the plaintiff's property rights was "wrongful." *Dice v. White Family Cos.*, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2007).

Pace does not dispute the operative facts; it contests only the district court's finding that its retention of the tooling was wrongful. As Pace observes, Ohio law grants a lien to a molder on a customer's tooling that is in its possession for "[t]he amount due from the customer" for manufacturing work performed with the tooling. Ohio Rev. Code § 1333.31(A)(1)(a). Best concedes that it did not pay Pace for almost $900,000 worth of products that Pace had manufactured with the tooling and delivered to Best. Nor does Best convincingly argue that Pace failed to comply with the procedural aspects needed under the statute to retain possession of the molding under the lien. *See* Ohio Rev. Code § 1333.31(B), (C). When Best demanded the return of its tooling in April 2008, therefore, Pace had a valid molder's lien under Ohio law that justified its refusal to return the tooling to Best. Without citing any legal authority, the district court nevertheless found that Pace "wrongfully" retained possession of the tooling because it had previously breached the Supply Agreement, including by using the tooling for its own purposes.

The district court was incorrect to hold that Pace's breach of the contract voided its otherwise valid lien, giving rise to liability for conversion. A lien is asserted against property, not against a person. *See Guernsey Bank v. Milano Sports Ents. L.L.C.*, 894 N.E.2d 715, 731–32 (Ohio Ct. App. 2008). The contractual relationship between the property owner and the holder of the lien is not relevant to whether the lien may be enforced because "the entitlement to enforce a . . . lien arises as a matter of law and not from a written instrument or verbal contract." *Id.* at 732. As long as the lienholder meets the requirements of the statute, the lien is valid, irrespective of the contractual relationship between the parties.

Whether Pace breached its contractual obligations to Best is not relevant to whether the elements of the statutory lien were met with respect to the tooling. There is no dispute that Best failed to pay for products that Pace manufactured for it with the tooling—and Best concedes that Pace was entitled to at least some of the unpaid amount. The only dispute was whether Best was entitled to offset the full amount it owed by recovering damages from Pace for the ancillary wrongs that Pace had inflicted upon it. While that question was being litigated, Pace had every right to retain possession of the tooling. Best may have accurately predicted that it would not need to pay the full amount it owed Pace once all of the offsetting damages were calculated. But until a court declared that Best had no obligation to pay "[t]he amount due" for the products that Pace had manufactured for it, Pace was statutorily authorized to retain possession of the tooling in question while Best refused to ante up. Ohio Rev. Code § 1333.31(A)(1)(a). If Best had wanted to obtain possession of the tooling while the parties' respective obligations were being litigated, it could have done so by depositing a bond with the court. *See id.* at § 1333.31(C)(2).

Because Pace retained the tooling pursuant to its valid lien, it did not "wrongfully" possess the tooling and is not liable for conversion. *See, e.g.*, *Lee Tool & Mould, Ltd. v. Fort Wayne Pools, Inc.*, 791 F.2d 605, 608 n.5 (7th Cir. 1986) (construing Indiana law). The district court was incorrect to find that Pace had converted the tooling before the parties' reciprocal obligations had been adjudicated in court, given the undisputed debt that Best owed to Pace when Pace retained the tooling. The portion of its judgment finding Pace liable and awarding damages on Best's conversion claim is reversed.

VI.

Pace next asserts that the district court erred in concluding that it was liable for tortiously interfering with both Best's business relationships and its business expectations. Finding that Pace sold cloned products in virtually identical packaging to at least four of Best's established customers in contravention of the Supply Agreement, the district court concluded that Pace's competition with Best was "wrongful" due to Pace's use of its confidential relationship with Best to further its mimicry of Best, coupled with the fact that Pace's conduct flatly breached its contractual promises to Best that it would not move in on Best's customers.

Pace first argues that, because there are multiple competing firms in the lighting products industry, Best failed to prove that it would have made sales to the four customers in question if Pace had not swooped in and sold to the customers instead. But as the district court noted, there is little dispute that the customers had established business relationships with Best and that Best at least had a reasonable certainty that they would continue to purchase products from Best rather than any competitor. *See Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993) (outlining elements for tortious interference with expectancy); *Dolan v. Glouster*, 879 N.E.2d 838, 848 (Ohio Ct. App. 2007) (noting that tortious interference with a business relationship "includes intentional interference with prospective contractual relations not yet reduced to a contract" (citation omitted)).

Pace primarily contends that the district court erred in concluding that its interference with Best's customer relationships involved "improper" means of competition. Ohio law directs that the question of impropriety be resolved by reference to the factors listed in the Restatement (Second) of Torts § 767 (1979), which generally focus upon the actor's conduct and motives, the interests of the parties, and the competing social interests in protecting business expectancy while preserving free competition. *See Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999).

Where there is room for disagreement on whether the defendant acted improperly, the determination is an issue of fact that is to be decided by the jury. Restatement (Second) of Torts § 767, cmt. l; *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248, 253 (Ohio Ct. App. 1996). But where the defendant establishes that his conduct amounted merely to

"fair competition" within the meaning of Restatement (Second) of Torts § 768, a tortious interference claim is barred as a matter of law. *Fred Siegel Co.*, 707 N.E.2d at 861. Section 768, in turn, provides that competition is "proper" where, among other things, "the actor does not employ wrongful means" in competing with the plaintiff. *Id.*

Pace's abuse of its confidential relationship with Best seems to have been the primary consideration motivating the district court's conclusion that, for purposes of both sections 767 and 768, Pace's competitive conduct was improper. The district court did not reversibly err in concluding that Pace's breach of confidence—coupled with the breach of a specific contractual promise intended to shore up that confidence—resulting in the production and sale to Best's customers of exactly identical products was an "improper" means of competition sufficient to give rise to liability for tortious interference. At root, the protection for "fair competition" exists in order to promote superior efficiency and service. *See* Restatement (Second) of Torts § 768, cmt. e. In this case, Pace's market edge came only from appropriating, wholesale, Best's product line and putative trade secret after duping Best into continuing the collaboration by specifically promising not to compete against it. Insulating Pace from liability for tortious interference on these facts would deter synergistic collaboration without encouraging marketplace efficiency and would not serve the primary purposes of § 768's "fair competition" safe harbor.

Finally, Pace is correct that Ohio law does not permit a tortious interference claim on the sole basis that a breach of contract was particularly flagrant or had substantially injurious knock-on effects; generally, even if a breach of contract "necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference." *Digital & Analog Design Corp. v. N. Supply Co.*, 540 N.E.2d 1358, 1368 (Ohio 1989) (internal quotation marks omitted). But an injured party may recover under a tortious interference theory if "the breaching party indicates, by his breach, a motive to interfere with the adverse party's business relations so that any resulting interference with business is no longer merely incidental to the breach." *Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.*, 689 N.E.2d 56, 61 (Ohio Ct. App. 1996). The same is true here. The harm to Best was not "merely incidental" to Pace's breach of its contract with Best, and the fact that Best secured for itself the additional protection of a binding

non-compete agreement does not mean that its recourse against Pace is now limited to an action in contract. The district court did not err in finding Pace liable for tortious interference.

VII.

Next, Pace contends that the district court erred in sua sponte amending Best's pleadings in order to award Best a $318,000 offset on Best's breach-of-warranties counterclaims. After Pace sued Best, alleging that Best breached the Supply Agreement by failing to pay for almost $900,000 in products that Pace had manufactured for Best, Best requested an offset and counterclaimed for breach of warranties, alleging that the products that Pace had manufactured pursuant to the Supply Agreement were defective. Despite recognizing that "Best's formal pleadings only enumerate claims based on defective goods purchased during the Supply Agreement," the district court ruled that Best had adequately argued and was entitled to damages for defective products that Best had purchased at any time from Pace, including before and after the parties entered into the Supply Agreement. The district court ultimately held that Best was entitled to a $318,077.38 offset from the amount that it owed to Pace, due to the defective products. Pace now argues that the district court erred in sua sponte amending Best's pleadings in order to allow it to recover damages for which Best did not initially ask and against which Pace was not prepared to defend.

"The general rule is when issues not raised in pleadings are raised by the express or implied consent of the parties, the court may treat the issues in all respects as if the parties had raised them in the pleadings." *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992). Best does not dispute that the district court amended the pleadings under Federal Rule of Civil Procedure 15; it argues only that Pace implicitly consented to the amendment because the issue was fully tried by the parties.

But we previously have counseled caution in finding that a defendant has acquiesced in a plaintiff's expansion of its theory of relief beyond what is outlined in the pleadings. "Implied consent is not established merely because one party introduced evidence relevant to an unpleaded issue and the opposing party failed to object to its introduction. It must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Id.* Otherwise, the court

runs the risk of violating the defendant's procedural due process rights by imposing judgment upon a claim against which the defendant did not know he had to defend himself. *Id.* at 357.

Because a defendant must have notice that an implied claim is being tried against him, "an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled." *Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995). That is the best characterization of what happened here. Best did, indeed, offer evidence at trial that it purchased defective products at various times during its commercial relationship with Pace, without specifically proving that all of the defective products were purchased under the Supply Agreement. But according to Pace, Best's identification at trial of products that it had purchased prior to or after the Supply Agreement demonstrated simply a failure of proof on the breach-of-warranties claim that Best had pled, not an implicit agreement by the parties to permit Best to expand its theory of relief. Pace claims that, had it known that Best would be permitted to recover damages for every defective product that Pace had ever sold to it, Pace would have altered its defense strategy and pursued arguments that Best's claims were barred by the statute of limitations and that products that had not been purchased under the Supply Agreement were subject to Pace's "standard terms and conditions," which expressly exclude all express and implied warranties.

In the absence of express or implied consent, Rule 15(b) does not permit a plaintiff to submit an assortment of evidence at trial and determine only afterwards which legal allegations fit the evidence; it is "not designed to allow parties to change theories in mid-stream." *Yellow Freight*, 954 F.2d at 358 (citation omitted). *See* Fed. R. Civ. P. 15(b)(2); *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 599 (6th Cir. 2009). Nor may a court do the same thing on the plaintiff's behalf. Best has not pointed to any area of testimony supporting its argument that "the parties understood the evidence to be aimed at the unpleaded issue." *Yellow Freight*, 954 F.2d at 358. In light of the fact that the evidence of defective products was generally relevant to the claim that Best had actually pled, we must presume that the expanded version of Best's breach-of-warranties claims was not tried by Pace's implied consent. *Douglas*, 50 F.3d at 1236.

Because the district court erred in sua sponte amending Best's breach-of-warranties counterclaims to encompass all defective products that Best had ever purchased from Pace, we

vacate its judgment finding Pace liable and awarding Best damages on those claims, and we remand for the district court to determine whether, on the facts that it found at trial, Best proved liability and damages only for products that Best purchased from Pace during the effective term of the Supply Agreement.

## VIII.

Pace also challenges several other aspects of the district court's rulings, including its damages calculations and the attorneys' fees award.[2]  In light of the reversal of the liability findings on several of Best's claims, however, each of the district court's damages, attorneys' fees, and injunctive relief awards must be vacated.  Rather than wade into the parties' damages disputes prematurely, we deem it prudent for the district court to reassess its damages and fees awards after excising the failed claims from consideration.  Nothing in our resolution of this case should be taken to preclude the district court from awarding the damages and fees (including punitive damages and attorneys' fees, to the extent that they are available) merited by the parties' conduct.

## IX.

For these reasons, we affirm the liability findings on the breach of contract and tortious interference claims; reverse the liability findings on the trade secrets claim, the Lanham Act claims, and the conversion claim; vacate the liability finding on the breach of warranties claim; vacate the awards of compensatory damages, punitive damages, attorneys' fees, and injunctive relief; and remand for further proceedings.

---

[2]Pace also asserts that the district court abused its discretion in excluding the testimony of one of its proffered expert witnesses, James Hooley.  Pace's position is without merit.