NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0338n.06

No. 12-3258

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 05, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KENDALL HOLDINGS, LTD., | ) | |
| d/b/a PHPK TECHNOLOGIES, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellant, | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| v. | ) | OHIO |
| | ) | |
| EDEN CRYOGENICS, LLC, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: COOK and WHITE, Circuit Judges; SHARP, District Judge.[*]

SHARP, District Judge. This appeal arises from a dispute between competing cryogenics companies over the use of purported trade secrets. Plaintiff-Appellant Kendall Holdings, Ltd., d/b/a PHPK Technologies ("PHPK") appeals the district court's grant of summary judgment to Defendants-Appellees on its misappropriation of trade secrets claim under the Ohio Uniform Trade Secrets Act (OUTSA). For the following reasons, we REVERSE the district court's decision and REMAND for further proceedings consistent with this opinion.

---

[*]The Honorable Kevin H. Sharp, United States District Judge for the Middle District of Tennessee, sitting by designation.

1

**I**

PHPK brought this suit against Eden Cryogenics, LLC ("Eden"), Eden's founder and president Steven L. Hensley ("Hensley"), and Jim Mitchell ("Mitchell"), an Eden employee, alleging copyright infringement, misappropriation of trade secrets, deceptive trade practices, and unfair competition.[1]

Hensley has worked in the cryogenics industry – which uses engineered products to store and manipulate gases and liquified gases kept at extremely low temperatures – since 1967, when he began his employment with CVI, Inc. ("CVI"), a cryogenics company. Eventually, he became CVI's Vice President of Standard Products. Mitchell began working for CVI as a draftsman in 1988. The next year, Mitchell left CVI and took a position as a firefighter with the Columbus Division of Fire. He maintained that job but came back to work for CVI as a part-time independent contractor in 1991; his job was to draft design and engineering drawings ("shop drawings") for CVI's standard products and cryogenic systems.

CVI's founder retired from CVI in 1991 and founded PHPK Technologies, Inc. ("Old PHPK"). Old PHPK initially operated as an engineering consulting firm. During that time, Hensley and Mitchell remained at CVI, which was acquired by Chart Industries, Inc. ("Chart"), in 1994. In 1995, Old PHPK moved into the business of cryogenic products manufacturing and hired

_____

[1] The factual background presented here is adapted from the district court's recitation of the facts.

Hensley away from Chart/CVI to create a standard product line. Old PHPK then hired Mitchell as an independent contractor in April 1995. He performed similar part-time design and drafting duties at Old PHPK as he had at CVI, all while continuing to work for the Columbus fire department.

Hensley became president of Old PHPK sometime between 1998 and 2000.[2] Mitchell testified that, at Hensley's request, he maintained a backup set of shop drawings on compact disc and in hard copy while working at PHPK. Because he often worked from home, he had shop drawings on his home computer, and he kept the backup copy of the shop drawings at home. Mitchell and Hensley both testified that these copies were made for safekeeping in the event of fire or a similar catastrophic event. Hensley testified that he authorized Mitchell to create the backup shop drawings and store them at his home.

In December 1999, Mitchell's independent-contractor relationship with Old PHPK ended. He did not return or destroy any of the approximately 2000 electronic shop drawing files from his time at Old PHPK, nor was he asked to. Hensley testified that at the time he terminated Mitchell's contract, he knew Mitchell had the drawings and had no objection to his continued possession of

---

[2] His deposition testimony and declaration conflict on the precise date.

them.[3]   Mitchell resumed working as an independent contractor at Chart (formerly CVI), a competitor of Old PHPK's, and continued in that role until May 2002.

In March 2004, Kendall Holdings, Ltd., purchased all of Old PHPK's assets, including its shop drawings, designs, catalog, customer lists, and pricing information and became Kendall Holdings, Ltd., d/b/a PHPK Technologies ("PHPK").  PHPK retained Hensley as its president, and he continued in the same role that he had at Old PHPK.  PHPK used Old PHPK's shop drawings and designs.  In July 2004, it hired Mitchell as an independent contractor.  In that role, he again created designs and shop drawings for PHPK standard products.

PHPK terminated Hensley in November 2004 because Richard Coleman, owner of Kendall Holdings, Ltd., decided to run the company on his own.  Mitchell left PHPK in December 2004. After leaving PHPK, Hensley was unemployed for nearly a year and then worked as a consultant in the cryogenics industry before co-founding a new cryogenics company, Brehon Cryogenics, LLC, in January 2006.  This company later became defendant-appellee Eden Cryogenics, LLC.  Eden designs and manufactures cryogenic equipment such as valves, bayonets, and piping, and is in direct competition with PHPK.  Hensley hired Mitchell to help design Eden's standard product line, and Mitchell designed these products by referring to his experience in the industry and the designs he created while at CVI and Old PHPK.

---

[3] Previously, Hensley testified that he had no awareness or knowledge that Mitchell had retained the drawings until this lawsuit was filed.

In late 2007, PHPK noticed that some of its longstanding customers were purchasing from Eden and that Eden was underbidding PHPK on projects. PHPK began an investigation, and concluded that Hensley and Mitchell had improperly acquired shop drawings, customer lists, and pricing information, and were using that information to build Eden's business. PHPK also concluded that defendants had copied PHPK's products catalog. Litigation eventually ensued, with PHPK bringing a host of claims: copyright infringement; misappropriation of trade secrets; deceptive trade practices; unfair competition; breach of fiduciary duty, duty of loyalty, and implied contract of confidentiality; conversion; tortious interference with business relationships; and civil conspiracy. Defendants counterclaimed alleging defamation, tortious interference, and abuse of process. Cross-motions for summary judgment were filed, and PHPK voluntarily dismissed several of its claims. On January 17, 2012, the district court entered an order granting in part and denying in part both parties' motions.

Subsequently, the parties voluntarily dismissed with prejudice all remaining claims and counterclaims except for PHPK's misappropriation of trade secrets claim. Thus, the sole issue on appeal is whether the district court properly entered summary judgment in favor of all defendants on the misappropriation claim.[4]

---

[4] The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1367. Our jurisdiction arises under § 1291. "[S]upplemental jurisdiction does not disappear when the federal claim that gave rise to original jurisdiction in the first place is dismissed." *Orton v. Johnny's Lunch Franchise, LLC,* 668 F.3d 843, 850 (6th Cir. 2012).

**II**

We review a district court's award of summary judgment *de novo*. *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). Summary judgment is appropriate if the pleadings and evidence show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court does not "weigh the evidence and determine the truth of the matter but . . . determine[s] whether there is a genuine issue for trial." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). On a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

**III**

PHPK urges us to reverse the district court because Mitchell could not have "misappropriated" Old PHPK's trade secrets in 1999 when he retained the shop drawings with authorization, according to evidence submitted by defendants at summary judgment. Thus, PHPK contends, it was error for the district court to hold that OUTSA's four-year statute of limitations barred this action.

Defendants argue that the district court based its holding on PHPK's original argument below – that Mitchell was not authorized to take the shop drawings when he left Old PHPK in 1999 – and that the court properly imputed to Old PHPK Hensley's awareness that Mitchell retained the drawings, prompting the limitations period to run. Alternatively, they assert that "there was no misappropriation to animate this case," either because Mitchell was permitted to possess *and use* the drawings, because the drawings were not "trade secrets" as a matter of law, or because Mitchell retained a copyright interest in the drawings.

## A

Under OUTSA, a plaintiff may recover damages from a party that misappropriated the plaintiff's trade secrets. Ohio Rev. Code § 1333.63(A). "Misappropriation" is defined in the statute as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or the disclosure or use of another's trade secret without the other's consent, if the discloser/user acquired it by improper means, in breach of a duty of secrecy, or with the knowledge that it was a trade secret and had been acquired by accident or mistake. Ohio Rev. Code § 1333.61(B).[5] "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Rev. Code §

---

[5] "Trade secret" is also defined in the statute. *See* Ohio Rev. Code § 1333.61(D). We discuss it *infra* at § III(B).

1333.61(A). An action must be brought "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Ohio Rev. Code § 1333.66.[6]

"Generally, a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Norgard v. Brush Wellman, Inc.*,766 N.E.2d 977, 979 (Ohio 2002). However, OUTSA incorporates the discovery rule, which provides that a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant. *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 60 (6th Cir. 2007) (citing *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 730 (Ohio 1983)); *see* Ohio Rev. Code § 1333.66. But in any event, the existence of a cognizable injury is a condition precedent to the discovery rule: it cannot operate to start a statute of limitations before an injury has occurred. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) (discovery rule "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he

---

[6] This circuit has recognized that, "[i]n order to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008). However, this formulation of the prima facie case is likely outdated in light of the Uniform Trade Secrets Act (UTSA). *See* Restatement (Third) of Unfair Competition § 40 cmt. b (1995) (explaining that UTSA imposes liability not just for the wrongful use or disclosure of a trade secret, as case law often recites, but also for its acquisition by improper means); *see also State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000) (noting that broader definition of "trade secret" in OUTSA "extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use" (citation omitted)).

discovers he has been injured") (Posner, J.). No amount of reasonable diligence would enable a plaintiff to discover an injury that has not yet occurred. *MAR Oil Co. v. Korpan*, No. 3:11-cv-1261, 2011 WL 5023263, at *3 (N.D. Ohio Oct. 20, 2011) ("The statute of limitations for a [trade secret] misappropriation claim cannot begin running until at least the earliest possible point at which misappropriation could have taken place.").

The district court, in holding that PHPK's misappropriation claim was barred by OUTSA's four-year statute of limitations, wrote that the "decisive issue" was the "determination of the time when Old PHPK or PHPK knew or should have reasonably known that Mitchell unlawfully acquired, disclosed, or used its trade secret information." It determined that there was "no dispute that Hensley" – then the president of Old PHPK – "knew that Mitchell retained the shop drawings when he terminated Mitchell" in 1999, yet Hensley did nothing to stop him from keeping the drawings, even though Mitchell went to work for a competitor of Old PHPK. After rejecting PHPK's suggestion that Mitchell and Hensley somehow conspired to steal the shop drawings and use them six years later, the district court found that "Old PHPK knew or should have known that Mitchell misappropriated trade secrets in 1999," approximately eight years before the instant lawsuit was filed, and thus its misappropriation claim was time barred.

The district court seemed to charge Old PHPK with inquiry notice of misappropriation because Hensley did nothing despite knowing that Mitchell retained the drawings when he was terminated in 1999. However, "misappropriation" under the statute requires "acquisition" by

"improper means." Ohio Rev. Code § 1333.61(B). At summary judgment, defendants themselves argued that Mitchell's "use of [the drawings] could not be deemed a misappropriation because he did not acquire the drawings by improper means and because he had Old PHPK's consent to possess and use" them. They submitted evidence that Mitchell was authorized by Hensley, an officer of Old PHPK, to retain the shop drawings upon his termination in 1999. *See* Hensley Decl., Sealed App'x at 270-71 (stating that Mitchell had his permission to possess hard copies and CDs of drawings and that, despite Hensley's awareness that Mitchell retained them, he did not ask him to return them upon termination in 1999); Mitchell Decl., Sealed App'x at 288-89 (corroborating Hensley's account); Appellees' Brief at 19-20.

In other words, in an attempt to demonstrate that PHPK's substantive claim of trade secret misappropriation lacked merit, defendants introduced evidence that fatally undermined their statute of limitations argument.

It is thus not undisputed that in 1999 Mitchell retained the drawings through "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *See* Ohio Rev. Code § 1333.61(A). In rejecting PHPK's original theory "that Mitchell and Hensley conspired to steal trade secrets so as to compete with PHPK" six years later, the district court simply assumed Mitchell had "misappropriated" them. However, defendants themselves created a fact issue on this point. Accordingly, the district court erred in holding that the statute of limitations barred PHPK's

trade secret misappropriation claim. Had it viewed the evidence in the light most favorable to PHPK – evidence introduced, ironically enough, by PHPK's adversary – no cause of action for misappropriation could have arisen in 1999 because evidence in the record supports a finding that Mitchell did not acquire the shop drawings in breach of any duty or by other improper means. *See* Ohio Rev. Code § 1333.61(A) and (B)(1).

**B**

Still, defendants would have us uphold the district court's grant of summary judgment either because no misappropriation ever occurred, because the shop drawings were not trade secrets, or because Mitchell held a copyright interest in them. However, material factual disputes preclude these findings as a matter of law.

First, a genuine issue of material fact exists concerning the scope of PHPK's consent. Did it permit Mitchell to retain the drawings (if at all) in 1999, or did it permit him to retain and use them? While defendants assert that "PHPK has come forward with no evidence" to rebut the proposition that "[t]here were no restrictions whatsoever on Mitchell's possession or use of the drawings when he stopped working with Old PHPK," the record indicates otherwise.

PHPK introduced evidence that the shop drawings were prominently stamped with the legend "INFORMATION SHOWN ON THIS DRAWING IS PROPRIETARY AND THE SOLE PROPERTY OF PHPK AND IS NOT TO BE DISCLOSED OR TRANSMITTED TO

UNAUTHORIZED PARTIES"; it introduced a copy of a consulting agreement dated April 1, 1995, bearing Mitchell's name (but not his signature; he avers that he had no employment contract with Old PHPK) and including a confidentiality clause; and it introduced evidence of other company policies that attest to the company's desire to protect confidentiality and safeguard proprietary information. From that evidence and corroborating testimony in the record, a reasonable fact finder could conclude that if any misappropriation occurred it occurred in 2006, when Mitchell used the drawings while designing products for Brehon (now Eden).

Next, defendants argue that the drawings cannot constitute "trade secrets" as a matter of law because they are not "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." *See* Ohio Rev. Code § 1333.61(D).[7] The district court made passing reference to defendants' alternative argument in its order, but does not appear to have based its holding on a finding that the drawings were not trade secrets. It seemed to assume, for the purposes of its analysis, that the drawings were trade secrets. *See* Dist. Ct. Op. at 18 (referring to the drawings as "alleged trade secrets").

---

[7] Defining "trade secret" as "information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

12

Six factors are used to determine whether information is a trade secret under Ohio Rev.

Code § 1333.61(D):

> (1) The extent to which the information is known outside the business; (2) the
> extent to which it is known to those inside the business, *i.e.*, by the employees;
> (3) the precautions taken by the holder of the trade secret to guard the secrecy of
> the information; (4) the savings effected and the value to the holder in having the
> information as against competitors; (5) the amount of effort or money expended
> in obtaining and developing the information; and (6) the amount of time and
> expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997).

"Ohio law recognizes that a party claiming trade secret status has the burden of demonstrating that it took reasonable steps to maintain the secrecy of the protected information." *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 302 (6th Cir. 2008) (citing *State ex rel. Carr v. Akron*, 859 N.E.2d 948, 955 (Ohio 2006)). However, "except where the evidentiary showing of reasonable efforts could not conceivably support a judgment in favor of the plaintiff, the reasonableness of the efforts is a question for the trier of fact." *Niemi*, 533 F.3d at 303; *accord Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) ("The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence.") (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.,* 492 N.E.2d 814, 819 (Ohio 1986)); *see also Rockwell Graphic Sys., Inc. v. DEV*

*Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) ("[O]nly in an extreme case can what is a 'reasonable' precaution [to maintain the secrecy of a trade secret] be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved.").

Because the legend, consulting agreement with confidentiality clause, and other policies discussed above could conceivably support a judgment in favor of PHPK, the reasonableness of Old PHPK's efforts to maintain its shop drawings' secrecy must be determined by the fact-finder. *See Valco*, 492 N.E.2d at 819 ("A reviewing court should not substitute its judgment for that of the trial court" on the "factual" issue whether a particular knowledge or process is a trade secret.).

Finally, defendants ask us to affirm the district court's ruling on the alternative ground that, because Mitchell held an ownership interest in the shop drawings pursuant to the Copyright Act, 17 U.S.C. § 201(a), he could not be found to have misappropriated them. Central to this argument is defendants' claim that Mitchell had no "work-made-for-hire" agreement with Old PHPK. However, there is at least some evidence in the record that Mitchell signed a consulting agreement giving PHPK ownership of his "ideas, inventions, improvements, and developments," as well as signing shop drawings bearing the "sole property of PHPK" legend. "So long as the parties' intent is clear, a transfer of copyright need not include any particular language. . . . 'It

14

doesn't have to be the Magna Carta; a one-line pro forma statement will do.'" *Gilleland v. Schanhals*, 55 F. App'x 257, 260 (6th Cir. 2003) (quoting *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir.1999)). Accordingly, a genuine issue of material fact precludes affirming the district court's grant of summary judgment on this alternative ground.

The district court's entry of summary judgment cannot be upheld on any alternative ground. Because we reverse, we need not reach PHPK's other arguments.

## IV

For these reasons, we REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.