NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0397n.06

Nos. 20-1449/1451

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| B&P LITTLEFORD, LLC, | ) | |
| Plaintiff-Appellant (20-1451), | ) | **FILED** |
| | ) | Aug 24, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| JOHN HARDAWAY, III, | ) | |
| Appellant (20-1449), | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| PRESCOTT MACHINERY, LLC; RAY MILLER, | ) | |
| Defendants-Appellees (20-1449/1451). | ) | OPINION |
| | ) | |

BEFORE: KETHLEDGE, STRANCH, and BUSH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** This misappropriation of trade secrets case had its genesis in 2012 when B&P Littleford began to hear from its customers that Defendants—B&P's former president Ray Miller and his new company, Prescott Machinery LLC—might possess trade secret drawings belonging to B&P. B&P was unable to obtain proof and so filed a complaint with the FBI in July 2015, but the FBI declined to investigate. Then, in February 2018, B&P learned that Prescott had been awarded a contract from the Navy to refurbish a large mixer originally designed and built by B&P's predecessor, and that Defendants possessed and were using B&P drawings to fulfill the contract. That May, B&P filed suit for misappropriation of trade secrets under the federal Defend Trade Secrets Act (DTSA) and the Michigan Uniform Trade Secrets Act (MUTSA). The district court granted summary judgment dismissing B&P's claims as outside the

three-year statute of limitations. The court also awarded sanctions against B&P and one of B&P's attorneys, John A. Hardaway. B&P and Hardaway both appeal. We **REVERSE** the judgment of the district court dismissing B&P's claims and imposing sanctions on B&P, **VACATE** the district court's award of sanctions against Hardaway, and **REMAND** that issue to the district court to reassess its award in light of this opinion, including our reversal as to B&P. We **REMAND** the case for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.   Factual Background

The facts are presented in the light most favorable to B&P. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B&P designs and builds industrial equipment, typically contracting the building of component parts to outside vendors. As part of its business, B&P maintains drawings of individual parts as well as assembly drawings that show how the parts are put together. B&P imposes strict nondisclosure requirements on employees and vendors with access to the drawings. B&P has in the past stored engineering drawings in hard copy. Currently, it maintains drawings electronically in both "editable" and "non-editable" form. Non-editable files are stored in B&P's "materials, requirements, and planning" system, accessible to the whole company, while editable files are stored in a secure "engineering database."

Defendant Ray Miller ran B&P as president and CEO from 1995 until 2008, when he was fired based in part on suspicions of misconduct. He was replaced by Laurence Slovin shortly thereafter. As part of the transition, Slovin brought in an intellectual property attorney, John B. Hardaway III, to ensure that B&P's system for protecting its intellectual property was effective and lawful. Slovin retained a private investigator to investigate Miller's alleged misconduct,

including self-dealing and destroying documents. According to Slovin, this investigation did not turn up evidence that Miller had taken any trade secret drawings. Nevertheless, B&P felt it had been harmed by the misconduct, and contemplated suing Miller. After negotiations, B&P and Miller reached a settlement, and Miller signed a release dated June 4, 2010, affirming that he did not have any of B&P's trade secrets.

Miller started his own company, Prescott, which he initially used as a vehicle to be a sales representative for other companies. He eventually expanded to servicing and repairing existing equipment. Slovin became aware of Prescott about a year after Miller left B&P, and by 2013 "understood that Prescott was competing in the same marketplace" as B&P.)

In August 2012, Prescott requested a quote from a vendor named Metaltek to manufacture parts, for which Miller provided engineering drawings. Metaltek forwarded the quote request to B&P, noting that it appeared to concern B&P parts. B&P's then-director of engineering, Timothy Coughlin, examined the drawings and concluded that they had been generated from two specific B&P drawings. This affidavit was presented to the FBI at some point.

B&P learned in 2013 that Miller and Robin Aurs, a former field technician for B&P, rebuilt a B&P machine for a company called Dow. B&P heard that Miller and Aurs had indicated they could provide spare parts and bring the machine to "OEM" specifications, which B&P has said could not be done without B&P drawings. Slovin, however, later testified that the Dow rebuild might not necessarily require the use of B&P intellectual property.

About the time he heard about Dow, Slovin learned about a letter sent by Aurs to another company, Nammo, saying that Prescott could supply "OEM parts." Although Nammo would not provide a copy of the letter, Slovin became suspicious that Prescott possessed B&P's technical drawings. He asked other vendors if they had heard from Prescott or if they had received a similar

letter, but "nobody knew anything." Also in 2013, a vendor called Cignys told B&P that it had received drawings from Prescott that closely resembled B&P drawings. But Cignys would not provide copies of the drawings because it was bound by an NDA with Prescott. In 2014, Metaltek told B&P it had received other drawings that were almost identical to B&P drawings; though Metaltek did not disclose the identity of the customer who had provided the drawings, Slovin believed it was Miller. Although B&P found the drawings to be identical to its own drawings, counsel advised Slovin that two drawings was not enough to take legal action, and suggested B&P go to the FBI.

These events raised "concern" and "suspicion" for Slovin and B&P that Miller and Prescott possessed all B&P's drawings. To learn more, B&P asked "several" other vendors whether they were "doing anything for Prescott," but they answered in the negative. B&P considered asking the FBI to investigate, and through Hardaway, consulted with the FBI in 2013 and 2014.

In the spring of 2015, B&P became aware of two more sets of drawings that might be in the hands of others. In April, the president of Cignys told B&P that he had drawings from Prescott for a specific part whose dimensions and tolerances would be impossible to duplicate without the B&P electronic files. Prescott also began offering on its webpage a vertical mixer, a major product for B&P.

On July 15, 2015, B&P, through Hardaway as counsel, submitted a complaint to the FBI. In the complaint, B&P explained that it believed Miller was "using the trade secret information to produce products for sale in Norway, China, Bulgaria, South Korea" and had "the entire electronic files of B&P's technical drawings." The FBI declined to prosecute but encouraged B&P to pursue litigation. B&P did not do so based on its continuing view that litigation would be risky, contentious, and expensive.

In 2017, the United States Navy solicited bids to repair and rebuild a vertical planetary batch mixer—used for solid rocket fuel—that had been installed at its China Lake Facility in California by B&P's predecessor in 1960. B&P hoped to win the contract because it was the only company with the ability to rebuild the machine. But ultimately, it did not bid because it lacked the capacity to take the machine offsite, which the Navy demanded.

Prescott was awarded the contract in late 2017 or early 2018. B&P learned that Prescott had won the project in February, and reached out to a vendor it thought might have been contacted by Prescott. According to the B&P employees involved, the vendor confirmed that he had received drawings from Miller and Prescott relating to the China Lake mixer, and provided copies to B&P. B&P analyzed the drawings and concluded they were copies of B&P drawings; B&P also learned, around the same time, that Prescott had sent a copy of a drawing for a specific blade used in vertical planetary mixers to another vendor, who confirmed that the drawing was very close, if not identical, to B&P's drawing of the same part. Miller and Prescott used 27 B&P drawings to fulfill the China Lake contract.

B&P submitted another complaint to the FBI. The FBI once again declined to prosecute, and B&P accordingly filed this case. During discovery, Miller offered an account of how he obtained B&P's drawings that contradicted B&P's 2015 theory. One of B&P's predecessors, APV, previously owned a complex of buildings, which in 1987 were divided into two attached properties: one building eventually purchased by B&P; the other sold to Lou Beer, the owner of Saginaw Industrial Machine (SIM), along with all the equipment, tools, and other belongings inside. B&P and its predecessors continued to rent storage space from SIM. During Miller's tenure as CEO of B&P, Beer was near bankruptcy, and at Beer's request Miller ordered all the B&P property that was being stored in the SIM building to be moved into his own building down

the street. As Miller's employment at B&P neared an end, he ordered that property to be moved back to Beer's empty building. Apparently, some things were left behind in Miller's building: the contents of that building were later moved to storage, and in early 2013, Miller discovered four locked file cabinets in the storage building. Miller said that he did not know what they were or where they came from, and when he could not unlock them, he drilled the locks and discovered professional papers that had belonged to Beer. These materials contained B&P drawings, including most of the drawings relating to the China Lake mixer. Miller suggested that Beer likely acquired those drawings directly from B&P in connection with a contract or RFP for SIM to manufacture parts for another large vertical batch mixer. Miller did not consider telling B&P that he had the drawings, because he "could care less about B&P." Miller also testified that he did not believe the drawings were confidential because they had been abandoned.

Several years later, Miller obtained drawings of the China Lake mixer a second time. Around 2013, Miller invited Edmond Henry to use an empty office at his building and to serve as a sales representative for Prescott. Henry was a former B&P employee who, Miller testified, had been fired for using a racial slur. In 2017, Henry submitted a bid on behalf of Prescott to refurbish the China Lake mixer for $775,550. Miller testified that Henry did this of his own accord; Miller claims that he did not instruct or authorize Henry to do so, did not participate in preparing the proposal, and did not recall learning about the bid until after it was submitted. At some point during this process—Miller speculated it was after Prescott won the contract, but was unsure— Henry provided Miller with B&P drawings related to the China Lake mixer that Henry had acquired in the course of his duties as a salesman for B&P. This included at least two drawings that were used to complete the China Lake project but were not contained in the locked file cabinet.

### B.    Procedural History

B&P filed its complaint on May 7, 2018, alleging violations of DTSA and MUTSA as well as common law causes of action, based on Miller and Prescott's use of five B&P drawings in the China Lake project.  B&P made broad document requests to assess the scope of Defendants' alleged misappropriation, but the district court limited discovery to the China Lake project and related misappropriations.

After Defendants sought leave to move for judgment on the pleadings, B&P requested and received permission to file an amended complaint and did so on April 25, 2019.  In this complaint, B&P limited its causes of action to DTSA and MUTSA, but alleged the misappropriation of 22 additional drawings relating to the China Lake mixer.  Having filed this expanded complaint, B&P requested leave to expand the scope of discovery.

During this time, B&P produced the 2018 FBI complaint in discovery.  That complaint, and employee depositions, suggested that B&P had previously communicated with the FBI, but B&P did not produce prior FBI submissions and nothing specific to this was disclosed during employee depositions.  On May 6, 2019, very shortly after filing the amended complaint and the day before Slovin's deposition, B&P produced the 2015 FBI complaint.  Defendants subsequently moved to compel discovery relating to B&P's investigation of Miller's misappropriation of trade secrets.  The magistrate judge denied B&P's request for additional discovery, but extended some of the discovery deadlines, granted Defendants' motion to compel, and resolved other pending motions.  Soon afterwards, Defendants moved for summary judgment.

In September 2019, the district court granted Defendants' motion on the ground that B&P's claims were filed outside the statute of limitations, and entered judgment against B&P.  B&P moved for reconsideration; Defendants opposed that motion and cross-moved for attorney's fees,

costs, and sanctions against B&P and Hardaway. On April 13, 2020, the district court denied B&P's motion and granted Defendants' motion in part, ordering B&P and Hardaway to pay Defendants $287,145.89 in attorney's fees, $42,482.18 in non-taxable costs, and post-judgment interest.

Hardaway timely filed an appeal of the district court's award of sanctions against him. B&P subsequently filed its own appeal of the district court's orders granting summary judgment, denying reconsideration, and awarding sanctions.

## II. ANALYSIS

### A. Standard of Review

We review de novo both the district court's grant of summary judgment and its denial of Plaintiff's motion for reconsideration of that grant. *See Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012); *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389–390 (6th Cir. 2008). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating there is no dispute of fact; if the movant succeeds, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). And a genuine issue for trial exists where "there is sufficient evidence favoring the nonmoving party" that a reasonable jury could return a verdict in that party's favor. *Id.* at 249. We do not judge credibility or weigh conflicting evidence; instead, we believe the evidence of the nonmoving party and draw "all justifiable inferences" in its favor. *Id.* at 255. "Where, as in this case, summary judgment was granted on statute-of-limitations grounds, we must determine whether . . . there exists a genuine issue of material fact

as to when the plaintiff's cause of action accrued." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run. If the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Id.*

### B.    Claims Under DTSA and MUTSA

The federal Defend Trade Secrets Act, Pub. L. No. 114-153, 130 Stat. 376, and the Michigan Uniform Trade Secrets Act, Mich. Comp. L. §§ 445.1901–445.1910, provide private causes of action for the misappropriation of trade secrets.

Under MUTSA, a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process" that is the subject of reasonable efforts to maintain its secrecy and derives independent economic value from that secrecy. Mich. Comp. L. § 445.1902(d). A trade secret is misappropriated under MUTSA when it is acquired by a person who knows or has reason to know that the trade secret was acquired by improper means; or when it is disclosed or used without consent by a person who a) used improper means to acquire it, b) knew or had reason to know it was acquired by another by improper means, or c) before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. *Id.* at § 445.1902(b). A claim under MUTSA "must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Id.* at § 445.1907. "[A] continuing misappropriation constitutes a single claim." *Id.*

Similarly, under DTSA, trade secrets are "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," which the owner has taken reasonable measures to keep secret, and which derives independent economic value from that secrecy. 18 U.S.C. § 1839(3). The definition of a misappropriation is the same under DTSA and MUTSA. *Id.* at (5). And, like MUTSA, DTSA contains a three-year statute of limitations and provides that "a continuing misappropriation constitutes a single claim." *Id.* at § 1836(d). Both statutes permit a court to award attorney's fees to a prevailing defendant if the claim was brought in bad faith. 18 U.S.C. § 1836(b)(3)(D); Mich. Comp. L. § 445.1905.

Both MUTSA, passed in 1998, and the DTSA, passed in 2016, were modeled on the Uniform Trade Secrets Act. *See* UTSA §§ 1, 6 (Unif. L. Comm. 1986); S. Rep. No. 114-220 (2016). Before UTSA was drafted, "jurisdictions were split on whether the limitations period ran only from the initial misappropriation, or whether it was triggered anew with each act of misappropriation." *Kehoe Component Sales Inc. v. Best Lighting Prods.*, 796 F.3d. 576, 583 (6th Cir. 2015). The former approach rested on a view of misappropriation of trade secrets as a breach of the relationship between the parties—which is not breached anew with each further use or disclosure—while the latter envisioned misappropriation of trade secrets as damage to property, which may be further damaged or destroyed by each additional use. *Id.* In declaring that "a continuing misappropriation constitutes a single claim," UTSA expressly adopted the former, relationship-based approach, and rejected the latter. *Id.* (quoting UTSA § 6 & cmt.).

Accordingly, we too have endorsed the "confidential relationship" approach to the various iterations of UTSA. "[I]t is the relationship between the parties at the time the secret is disclosed that is protected," and "[t]he fabric of th[at] relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated." *Id.* (quoting

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 293 (9th Cir. 1969)). Thus, "the first discovered (or discoverable) misappropriation of a trade secret commences the limitation period, placing the focus . . . on the breach of the relationship between the parties at the time the secret is disclosed." *Id.* (quoting *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 Fed. App'x 473, 482 (6th Cir. 2015)). Stated differently, although the initial wrongful acquisition of the trade secret and each subsequent misuse are separate acts of misappropriation, "a *claim* for misappropriation arises only once . . . at the time of the initial misappropriation, subject to the discovery rule." *Amalgamated Indus. Ltd. v. Tressa, Inc.*, 69 Fed. App'x 255, 261 (6th Cir. 2003). "[E]ach new misuse or wrongful disclosure is [then] viewed as augmenting a single claim of continuing misappropriation rather than as giving rise to a separate claim." *Id. (*quoting *Cadence Design Sys., Inc. v. Avant! Corp.*, 57 P.3d 647, 651–52 (Cal. 2002)). The goal of this rule is not to pressure the owner of a trade secret to file suit prematurely, but rather to ensure such an owner "conduct[s] a timely and reasonable investigation after learning of possible misappropriation." *Stolle*, 605 Fed. App'x at 482 (quoting *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 Fed. App'x 55, 62 (6th Cir. 2007)). That obligation is "wholly consistent with the nature of trade secrets; because trade secrets are not subject to a filing system, owners' diligence in taking affirmative steps to protect them is crucial." *Adcor*, 252 Fed. App'x at 62.

### C. Timeliness of Suit

The district court held that B&P's claim accrued no later than 2012 and was therefore time-barred when B&P filed suit in 2018. In reaching that conclusion, the court relied on B&P's statements in the 2015 FBI Complaint that it became "aware" of possible trade secret misappropriation when "[t]he information began appearing in 2012" and that it believed Miller possessed "the entire electronic files of B&P's technical drawing." And although B&P argued

that Defendants never had the electronic files and that it only discovered the misappropriation at issue here in 2018 when it became aware of Miller's possession of the China Lake drawings, the court was unconvinced: the use of the drawings of the China Lake mixer was merely a "continuing misappropriation," and B&P's argument to the contrary was an attempt to "revert back to a pre-UTSA property-based theory of trade secret misappropriation."

The continuing misappropriation rule provides that the repeated misappropriation of a given trade secret forms a single claim, not multiple claims, because a confidential relationship "once rent" cannot be "torn anew." *Kehoe*, 796 F.3d at 583 (quoting *Monolith Portland Midwest Co.*, 407 F.2d at 293). Thus, it is the first discoverable misappropriation of "*a* trade secret" that commences the limitation period for a claim based on misappropriation of *that* trade secret. *Id.* (emphasis added). But nothing in MUTSA, DTSA, or relevant caselaw suggests that a misappropriation of one trade secret can trigger the limitations period for a claim based on the misappropriation of a *different* trade secret. In *Kehoe*, for example, the plaintiff argued that the statute of limitations had not run because the defendant used "new and different trade secrets each time it manufactured a new knockoff product." *Id.* We accepted the premise of the argument—that the use of different trade secrets could be a new misappropriation—but rejected the argument on factual grounds, because the plaintiff had "fail[ed] to identify what those alleged [new] trade secrets might be, especially considering that 'readily ascertainable' design features of individual products are not trade secrets." *Id.*

Neither DTSA nor MUTSA provides explicit guidance on when to classify particular pieces or bodies of information as different trade secrets. And as the Colorado Supreme Court has observed, "virtually any two pieces of information can be conceived of as constituent elements of some greater whole," or, alternatively, as distinct from each other. *Gognat v. Ellsworth*, 259 P.3d

497, 502 (Colo. 2011). "[A]voiding arbitrariness in differentiating one from another" therefore requires a "controlling principle consistent with the purposes of the statutory accrual rule." *Id.* The focus of the UTSA discovery rule, as we have explained, is on "the relationship between the parties at the time the secret is disclosed." *Kehoe*, 796 F.3d at 583. So, we might ask whether the same relationship has been ruptured in the same way, looking, for example, at who made the disclosure, to whom the disclosure was made, and the nature, timing, and reasons for the disclosure. *See Gognat*, 259 P.3d at 503. The subject matter of the different pieces of information may also be relevant, depending on the circumstances. Ultimately, just as the determination of whether disclosed information is a trade secret is a fact-specific inquiry, *see, e.g.*, *Hayes-Albion v. Kuberski*, 364 N.W.2d 609 (Mich. 1984), so too is the determination of whether disclosed information constitutes one trade secret or many, *see Gognat*, 259 P.3d at 503.

It is undisputed that Defendants did not actually possess B&P's entire electronic files, as B&P once believed they did. But as a result of the court's denial of B&P's requests for broad discovery to assess the scope of Defendant's misappropriation and its order limiting discovery to the China Lake mixer, it is unclear what documents or drawings Defendants did have, when they had them, and how they got them. Specifically, the record lacks key details regarding the drawings acquired by Defendants that B&P learned about from 2012 to 2015, including what specific parts they concerned (though we know the drawings related to machinery distinct from the vertical mixer installed at China Lake) and how Miller and Prescott obtained them. Miller testified that he first obtained the China Lake drawings in 2013, when he opened Lou Beer's locked file cabinet after finding it in one of his buildings. Though he declined to return the drawings to B&P, there is nothing in the record about what, if anything, he did with them. Miller testified that in 2017 or 2018, he received more China Lake drawings from Henry, who had obtained these drawings while

a salesperson for B&P. Henry had previously been fired from that role after using a racial slur, and thereafter went to work for Prescott on commission. According to Miller, Henry applied for the China Lake contract on his own initiative and without Miller's knowledge, instruction, or authorization. Miller claimed Henry told him about the contract only after Prescott had won it, and subsequently gave Miller the relevant drawings.

Drawing inferences in B&P's favor, as we must, a reasonable jury could conclude that the acquisition and use of the China Lake drawings in 2017 or 2018 was a new misappropriation because the China Lake drawings could not have been misappropriated by Miller before he obtained them. And, at least on this record, the earlier alleged misappropriations represented a breach only of Miller's relationship with B&P. But the 2017 or 2018 acquisition derived from Henry's initial acquisition of the China Lake drawings by improper means, *i.e.* the breach of *Henry's* confidential relationship with B&P. That a different relationship was damaged supports the conclusion that under the relationship-based approach of UTSA, the later acquisition and use gave rise to a new claim of misappropriation.

Defendants argue that the evidence of when and how the China Lake drawings were acquired and used is irrelevant. According to Defendants, the limitations period begins to run when a plaintiff becomes aware of facts sufficient to encourage further investigation into a potential misappropriation, even if there is record evidence suggesting that the misappropriation at issue had not actually occurred at that time.

That position is untenable. It is well established that the limitations period for a given claim of misappropriation begins to run when it is discovered or reasonably discoverable. *Kehoe*, 796 F.3d at 583 (quoting *Stolle*, 605 Fed. App'x at 482); *see also Amalgamated Indus. Ltd.*, 69 Fed. App'x 261 ("a claim for misappropriation arises . . . at the time of the initial misappropriation,

subject to the discovery rule"). This necessarily requires an underlying alleged misappropriation, because "[n]o amount of reasonable diligence would enable a plaintiff to discover an injury that has not yet occurred." *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 457 (6th Cir. 2013). In *Kendall Holdings*, for example, the defendants contended that the statute of limitations had begun when the plaintiff knew that one of the defendants, a former employee of the plaintiff—had retained trade secrets when his employment ended. *Id.* at 457. We rejected that argument because evidence in the record suggested that the defendant's retention of the information had been authorized by the plaintiff, and if there was no underlying misappropriation, then the plaintiff could not have been aware of it. *Id.* at 457–58; *see also Porex Corp. v. Haldopoulos*, 284 Ga. App. 510, 511–12, 514, 518–19 (Ga. Ct. App. 2007) (reversing grant of summary judgment on statute of limitations grounds where there was no evidence to suggest that defendants were actually misappropriating trade secrets at the time plaintiff suspected they might be). By the same logic, a plaintiff's suspicion of a misappropriation cannot trigger the limitations period for a claim based on a misappropriation of a trade secret that has not yet occurred.

In addition, even if further factual development leads a reasonable jury to conclude that Miller's 2017 or 2018 use of the China Lake drawings was a continuation of an earlier misappropriation of which B&P had notice, there is record evidence to support the conclusion that B&P conducted a reasonable investigation. From 2012 to early 2015, multiple vendors on multiple occasions told B&P that Miller had provided them with drawings that were identical or very similar to B&P drawings—Metaltek in 2012 and 2014, and Cignys in 2013 and April 2015. Slovin also heard in 2013 that Miller and Aurs were offering to rebuild B&P machines, provide spare parts, and bring the machine to OEM specifications, and Metaltek reported to B&P that it had received another quote from Miller with a B&P drawing attached, in July 2014.

In 2013, after examining the first two Metaltek drawings, B&P learned that Prescott had offered to supply "OEM"-compliant equipment to Dow and Nammo, which suggested to B&P that Prescott had B&P drawings. But Nammo would not provide Slovin with a copy of the letter containing that offer. Slovin asked several B&P vendors if they had received similar offers, but "nobody knew anything." Also in 2013, B&P learned that Cignys had drawings from Prescott, but Cignys would not provide the actual drawings due to an NDA with Prescott. In November 2014, Metaltek provided B&P with drawings it had received from another company that were similar to B&P drawings. But Metaltek would not reveal the source of the drawings, though B&P believed it to be Miller. In April 2015, B&P again learned that Cignys had B&P drawings from Prescott.

During this time period, B&P asked its vendors if they had received drawings or if they were "doing anything for Prescott," but the vendors provided no information that would point to misappropriation. B&P did not learn until later that at least one of these companies—Mistequay—had in fact received B&P drawings from Prescott, but had concealed this from B&P. Having reached a dead end, B&P decided to ask the FBI to investigate. B&P submitted its complaint to the FBI on July 15, 2015, but the FBI declined to prosecute.

From this evidence, a jury could find that B&P satisfied its obligation of conducting a reasonable investigation: it attempted to unearth evidence of misappropriation but was stymied by a lack of documentation and its vendors' responses, and thereafter turned to the FBI for assistance. Without drawings or further leads, B&P was not in the position to file a lawsuit against Defendants in good faith, as Defendants contend it should have. That sets this case apart from *Stolle* and *Adcor*, which Defendants argue dictate the outcome here. In *Stolle*, plaintiff Stolle learned that customers were claiming the defendant had taken its drawings, but Stolle had not

contacted those customers and had not pursued a formal FBI investigation despite initially reaching out. 605 Fed. App'x at 483. In *Adcor*, multiple Adcor employees had testified that they had heard the defendant possessed Adcor's trade secret drawings, but Adcor had not pursued an investigation, despite having the means to do so. *Id.* at 60–62. And ultimately, the court observed, Adcor did "discover[] drawings and other evidence of misappropriation in an unlocked safe"—in other words, if Adcor had conducted a reasonable investigation when its duty was first triggered, it would, in fact, have been successful. *Id.* at 62.

There are multiple issues of fact relating to Defendants' alleged misappropriation of the China Lake drawings—including whether Miller's receipt of drawings from Henry in 2017 or 2018 gave rise to a claim of misappropriation separate from his earlier acquisitions of B&P drawings, and if it did not, whether B&P conducted a reasonable but unsuccessful investigation that would toll the statute of limitations until it learned about the China Lake project in 2018. The district court's grant of summary judgment was premature and further factual development is required. Finally, because Defendants are not yet the prevailing party—and because in any event, B&P's claim was not meritless—the award of sanctions under DTSA and MUTSA was inappropriate. *See BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 752 (6th Cir. 2010); *Degussa Admixtures, Inc. v. Burnett*, 277 Fed. App'x 530, 534 (6th Cir. 2008); *Bearing360 LLC v. Cameron*, No. 330812, 2017 WL 3798491, at *5–7 (Mich. Ct. App. Aug. 31, 2017).

We reverse the district court's grant of summary judgment to Prescott and Miller and the award of fees, costs, and interest based on that judgment.

### D. Sanctions Against Hardaway Under 28 U.S.C. § 1927[1]

We review an imposition of sanctions on an attorney pursuant to 28 U.S.C. § 1927 under the abuse of discretion standard. *Garner v. Cuyahoga Cnty. Juvenile Ct.*, 554 F.3d 624, 634 (6th Cir. 2009). To reverse a sanction, we must have a "definite and firm conviction that the trial court . . . relie[d] upon clearly erroneous factual findings, applie[d] the law improperly, or use[d] an erroneous legal standard." *Id.* (quoting *Berger v. City of Mayfield Heights*, 265 F.3d 399, 402 (6th Cir. 2001) and *Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004)).

Section 1927 permits a court to impose personal liability for excess costs, expenses, and attorney's fees upon an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions are warranted "when an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1049 (6th Cir. 1996) (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)). Something more than negligence but less than bad faith is required: "an attorney is sanctionable when he intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006); *see also Garner*, 554 F.3d at 644–45. The purpose of § 1927

---

[1] B&P argues that to the extent the district court imposes sanctions on it under 28 U.S.C. § 1927, the action was improper. Though we have already reversed sanctions against B&P, we pause to address this argument. It is true that § 1927 imposes personal liability only on counsel and does not authorize the imposition of sanctions on a represented party. *BDT Prods.*, 602 F.3d at 750. But nothing in the district court's opinion suggests that § 1927 was the basis for the sanctions against B&P. Defendants moved for sanctions against B&P under DTSA and MUTSA and against Hardaway under § 1927, and the district court granted the motion: "Defendants' motion for attorney's fees against Plaintiff will be granted. Additionally, Attorney John Hardaway will be sanctioned pursuant to 28 U.S.C. § 1927."

is "to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Id.* at 644 (quoting *Red Carpet Studios*, 465 F.3d at 646).

The district court concluded Hardaway should be jointly liable with B&P for Defendants' attorneys' fees and costs because he "was aware that Plaintiff's claims were time-barred" when he prepared the complaints in this lawsuit and because he was aware of the 2015 FBI Complaint but failed to produce it until late in discovery.

As we have already held, B&P's complaint is not frivolous and so sanctioning Hardaway for bringing this suit was clearly erroneous. At issue is whether the district court abused its discretion in finding that Hardaway unreasonably and vexatiously multiplied the proceedings by failing to produce the 2015 FBI Complaint. The issue is somewhat complicated by the fact that B&P's complaint was limited to the China Lake project and its requests for broad discovery to assess the full scope of Defendants' misappropriations were denied. Withholding that FBI complaint until a week before the discovery deadline and the day before Slovin's deposition, however, inhibited Defendants' ability to make follow-up discovery requests and to ask detailed questions about the document at that deposition. The 2015 FBI Complaint, moreover, was prepared and signed by Hardaway and was relevant to understanding the nature of Defendants' alleged misappropriation and when B&P became aware of it. Despite Hardaway's arguments that he was not "principally in charge of discovery," his signature was on B&P's pleadings and his name was included in the signature block of various submissions filed by B&P in connection with discovery. A district court has broad discretion regarding discovery and trial matters and we do not conclude that the imposition of sanctions against Hardaway was an abuse of that discretion.

An attorney, however, is liable under § 1927 "solely for *excessive* costs resulting from the violative conduct." *Garner*, 554 F.3d at 645 (emphasis in original) (quoting *Ridder v. City of*

*Springfield*, 109 F.3d 288, 299 (6th Cir. 1997)).  We therefore vacate the district court's award of sanctions against Hardaway and remand for the court to take up the motion for sanctions in light of the pleadings, record, and rulings in the case, and if appropriate, to fashion an award for any fees and costs that were "reasonably incurred" by Defendants as a direct result of Hardaway's misconduct in discovery.  *See* 28 U.S.C. § 1927; *see also Garner*, 554 F.3d at 645.

### III.    CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment and imposition of sanctions as to B&P, **VACATE** the district court's imposition of sanctions on Hardaway and **REMAND** that issue for the court's reassessment.  We **REMAND** the case for further proceedings consistent with this opinion.